Good morning, Your Honors. My name is the Court. I'm Sarah Burnham. I'm an author of Plaintiff Notes, and many of the plaintiffs are here today. I will keep track of my time, but I'd like to reserve about three minutes for rebuttal, if I may. The District Court, in dismissing the plaintiff's National Historic Preservation Act, claimed there are two reasons. First, the Court visified the Ninth Circuit's standard for standing in procedural rights cases. And second, the District Court departed from the Supreme Court precedent by expanding the political question doctrine to apply to a court's consideration of the four-part test of our injunctive relief. Setting aside, for now, the issue of injunctive relief, and assuming, for the sake of argument, that injunctive relief is not on the table, plaintiffs, nonetheless, have said the vacature of the Department of Defense's findings under the NHPA and the agency would redress the plaintiff's procedural harms. As the Manhattan versus DeFrancois might be making their procedural rights more special, once a plaintiff has asserted a procedural injury, and the injury in this case is not disputed, then the causation and redressability requirements are relaxed, since a plaintiff must only show that they have a procedural right which, if exercised, could address their concrete interests. And plaintiffs have made that standard in this case. And can I ask you a question? What do you contemplate for the rest of the Department of Defense, particularly after the proper judicial judgment process occurs? What is it exactly that you think they might do differently in order to make that process go forward? Yeah, well, to a certain extent, the process should expose the types of actions that are possible to mitigate any adverse effects. But it is possible that they could make adjustments to the design or operation of the base. And focusing on the operation of the base, I think, is useful because it's contested that the Department of Defense has exclusive control over operations. And so, therefore, going forward, it's feasible to make adjustments to operations to avoid or mitigate harms without reopening any executive agreement with Japan, without undoing the 2006 roadmap. And so there are steps that the agency could take that might redress that concrete interest. Okay, so you're not – it is not the case that the mere building of the base in the locations that's selected will basically absolve the harms that could be inflicted? Well, clearly, the construction is a large part of it. And we've pledged that the bay is going to do huge damage to that habitat. But there are other ways that the number of flights coming in and out of the base, the way the runoff is managed, how much it's illuminated, other ways that could impact the do-go. And it's important to remember that to show addressability is not an all-or-nothing. It is enough to show that the harms could be partially mitigated. So we don't have to stop construction of the base in order to address mighty harms. I'm sorry if I'm focusing on that too much. But let's say that that were the only way to prevent harm to the do-go. I guess I just find myself thinking that that was the only easy thing we have to get from the Department of Defense to remember that there would be a demand essentially of clients. And I can see how maybe this would be a problem for our part to try to adjudicate. You're just saying that's not the case. I mean, even if the base gets built in the same location, just in the post-construction operational adjustments, that would be enough to provide a meaningful relief to your clients. I would attitude it, yes, Phil Arthur, that making adjustments to avoid and mitigate would provide some remedy. But I would also say that it is not impossible for the Department of Defense to decide after going through the procedures required by the statute, consulting from stakeholders, considering all of the relevant information. They have the power, they have the ability to say in light of all this, we are not going to go forward. Or we're going to build the base somewhere else. Or we're not going to build the base. I'm not saying that's not the case. I don't want to talk over you, but that's a very big ask. And I recognize that. But I just wanted to highlight the difference between can't and won't. Because if it's a matter of won't, if it's just that a priori before going through the procedures, the agency says, you know, it doesn't matter what these procedures turn out, there is no information. We're just dead set on building this base. That's different from saying we cannot go back in time and undo this treaty. And that is not the case here. The Department of Defense could decide in a change of policy. And I want to highlight that it would be the agency, it would be the Department of Defense's call to make. It would not be, we are not asking this court, Your Honor, to make that underlying policy determination. We are asking the court. I know, I know. But I guess it does not seem realistic at all to think that this base is going to get built somewhere outside. I mean, maybe as a tactical matter, you're right, it's not impossible. But, I mean, we know from what the government has told us, that this ain't going to happen. This base is going to get built there. And we have, you know, entered into a binding bilateral agreement with Japan, right, for that to happen. And there are all sorts of diplomatic and defense-related considerations that just can't, it just seems impossible to unravel all of that now. So if it were the case that the mere building of the base in the place where it's going to be built would just inflict all of the harm to the new government, could be inflicted, then I would be skeptical that these post-construction operational mitigation measures you're talking about wouldn't provide any meaningful towards these new consignments. And that would raise a redressability issue, it seems to me. Well, I would like to highlight that the requirement of the statute is avoid or mitigate. And that the Nizerian's cases on rescinding are clear, that you don't have to redress the harm in its entirety. That partial redress is enough towards an understanding. And because the way that happens at the agency, what would be the partial redressability here, would be steps to avoid or mitigate harms to the government that fall short of abandoning construction altogether. So it might be that the number of planes coming in and out can affect how much noise there is. And so if you reduce the number of planes, there is operational measures or steps that could be taken to minimize harm. That would be partial redress, and that would be enough to establish that. If we did award the Department of Public Health Justice to the South Somaliland and its obligations under the moral, legal, and moral capacity, would that be declaratory or injunctory? Well, the initial step would be a declaration, declaratory relief in the sense of a declaration that the Department of Defense's findings do not comply with the requirements of the statute. There are also, if you were interested in our complaint, the Senate Administrative Freedmen Visa vacature and remand. Those are not injunctive. And so at a minimum, we're talking about a declaration that they violated the statute, vacature and remand to the agency. If we were to succeed on the merits on whether or not they have complied with the statute, then we could get to briefing on the forepart standard for whether injunctive relief should be issued in the case. And so with respect to injunctive relief, I think it's my question, looking at what you're asking for in your complaints, that it seems like it would require the court to control access to military bases, as well as altering the terms of access for Japanese nationals, or Japanese soil. So, doesn't this present a political question under the version of vacure factor? The approach that the district court took in applying the vacure factors, the political question doctrine, to. I'm not talking about the district courts, which answer that question for me, On your point, can I refer to the district court? Sure. My answer is that the familiar forepart test for injunctive relief adequately encompasses, it guides the court's discretion, and it allows the court to take into consideration the political separation of powers concerns. By giving deference to the agency in those third and fourth grounds, it's in the balancing of the harms and the weighing of the public interest. And so, rather than abdicating the court's article three responsibility in favor of the executive, the approach that the district court has taken is to go forward, apply the standard, engage in the balancing of harms and the weighing of the public interest, give deference to the executive, what issues of national security and foreign policy arise. May I just point the court to Winter versus Natural Resources Defense Council, which was a case challenging the Navy's conduct of security exercises using sonar in the Pacific on the coast of California. And the court made a decision on the merits, a political question doctrine problem there, went on to apply the standard for injunctive relief. In that case, the court found that the military and security issues outweighed the things of interest, outweighed the plaintiff's interests. But the court specifically said that military interests do not always trump other considerations, and we have no doubt that they do. So to expand, and I'm not aware of any other case in which the political question  not to the underlying legal claim that the court's being asked to answer, but simply to the request for injunctive relief. And to follow the district court's approach is to essentially allow military interests to trump, because it bars the court from even engaging in the balance of the harms and the weighing, which are traditionally manageable standards, which is the second way to come from. And we know that courts do that all the time. And in our brief statement, we have a long, many of those cases, but I think Winter really is injunctive. And just a question about, in terms of the relief, when we were talking earlier about what realistically the department might do differently, you mentioned purely post-construction, operational mitigation measures. Is there something else in terms of the construction of the base? Because obviously if that's all that's in play, then there's no reason for the district court to contemplate an injunction stopping the construction of the base. No. Can I clarify a point there? The injunction that we requested was not in total, it was not to enjoin construction of the base in its entirety. It was merely a time-limited injunction on the Department of Defense's staff in allowing construction to go forward, pending their completion of the procedure. So I think that's a meaningful difference. There's one. Yeah, there's one. If you want to tell me or tell us, please, what is the injunction relief you were seeking? Because according to the approach to the base, what you quote, you don't ask for either papers, what are you asking for in terms of the construction of the base? So I think that the country student turns on a fact of the arrangement between the Department of Defense and the NWN, which is that the United States has explosive control over their military bases. And so therefore, to enter into the case in a trial and ascertain do they need an area in the structure around Camp Schwab requires DOD approval. It essentially requires a permit from DOD. And so that is the injunction that we are requesting. We are asking that DOD not issue any of those permits to allow permits, those permits that allow what? That allow construction workers from Japan to enter into the base to begin construction, not permanently, just until they have complied with the procedures. I know. I know. If you're dedicating all you could hope for, if you're just taking into account processes to be successful the way you want it to be, all you could hope for are post-construction operational mitigation measures, then why would the base, there would be no reason for the injunction relief you're seeking, right? You don't need a sort of state court order because you're just, you want something that's going to happen all the time. I mean, you can put the workers coming on board, but in fact, the flight's going over. So, you know, that's the only example I can give it so far of this sort of moderated sort of relief. And I endeavored to provide some examples of what the Department of Emergency could do. During construction? No, during operation. I'm sorry. I hope I'm about to answer your question. And that is because that is, it doesn't raise the problem of reopening the treaty. It doesn't raise the concern. We would like to hold a little possibility that there might be other things that the Department of Defense could do, but those would become evidence through process, but examining exactly what the harms will be, examining what elements of construction and operation will harm the dugong and what steps might be taken. So, I feel it's a little preemptive to have to state exhaustively all, and this is insane, all the possible steps that the Department of Defense could take in order to make it enhance. So I just wanted simply to show that there was at least something enough to show that there is some element of addressability at this stage. What would the Department of Defense need to do to comply with Section 402 in your view? Because it seems like it's a very simple thing to take into account. Yes. Standard. It seems like there would be some deference to them in that take into account standard. I understand that it's just logical and ironic, I'm not sure why they would just say, hey, we'll take things into account, but what would they need to do? My initial reaction to that is that I anticipate they will make that timeline as to whether or not they have taken into account. And I would argue at this point, we can look back to the District Court's 2008 order, where the District Court said that the plain language of Section 402 combined with express legislative purpose reveals clear congressional intent regarding the basic components, and then goes on to list them. The elements of those steps that we feel the Department of Defense has not adequately taken is that, first of all, they did this essentially, it's not in secret, and without notifying the public, certainly not notifying us. So there was no opportunity to engage in any of the kind of the public comment process that you would usually see. They did not consult with any of the plaintiffs, in this case, who have made clear their interests as stakeholders. I know what you want. The final minimum is required. Are you saying that that's the minimum required that they have to consult because then it looks like you're applying sort of our environmental sort of standards onto this? And I know there's a lot in common, but it's a very different language and forms of what is required in APA. So just what would be the minimum? The minimum, I think, the District Court did a good job of laying those out. The process at a minimum must include identification of protected property, generation, collection, consideration, and weighing of information, pertaining to how the undertaking will affect the historic property, a determination as to whether there will be adverse effects, development and evaluation of alternatives that could avoid or mitigate, and that they do this process not on their own in isolation, but they engage the host nation and other relevant private organizations and individuals in a cooperative partnership. I think that's a good place to start. I'm conscious of my time. Is there enough of a record of appeal to review the merits and determine whether the appeal did, in fact, fulfill their responsibility or should be subject to appeal? I would like to offer supplementary briefing to the court and think that it's going to go that route. No, I was just asking you. I don't think so. Your Honor, I think that we need to go through the merits and have the District Court determine what taking to account means and how it should be applied in this situation. Okay. Thank you. Your Honor, I'd like to respond. We have a case in court. Mark A. from the Department of Justice with me at the counsel table. He's Jonathan McKay from the Department of Navy Office of General Counsel. In the case I would start, we're responding to the court's last question about whether there's enough information in the record. I think the supplement I'll make to the record, I think the Secretary's finding with respect to compliance in Section 4, Option 2, the Secretary may have finding is laid out in the excerpts of record that appears on page 60 through 91 or 61 through 90. That satisfies whatever obligations the Secretary can, with respect to Section 4, Option 2, that would be a basis for a decision here. Unfortunately, the doctrine of, I guess it was, I think it was the practice that the court's kind of assuming jurisdiction and disposing of a case on the merits when there was no jurisdiction question is no longer permitted by the, sort of taken forth in here. There's just a jubilating problem that the court needs to address. So I'm going to guess that Michael, I know I gave you a lot of, you seem to have more extensive administrative records in the district court. You had that opportunity and you didn't do that. I'm not sure why, Your Honor. I think that some of the questions were, some of the issues were, confidentiality concerns with the government of Japan, the government of Japan not wanting the United States to be revealing certain information, and not wanting to get crosswise with the government of Japan's environmental assessment process. I think many of the documents that are in the government's administrative record are being provided to the plaintiffs under FOIA, and this might have been provided since 2008. But the administrative record was not submitted to the district court. Okay. I didn't get to your position that this case is always presented with political questions from the beginning of the lawsuit, or that this political question emerged only recently. Because it doesn't look like you presented it previously. Well, I think you do. I mean, it seems like you've changed your litigation strategy here. I'm just trying to figure out what's going on. From this point of view, though I think the first time that political question got raised was in 2008, but even in 2005, in response to the first lawsuit that was dismissed, there is a number of ways of standing where it raises justifiability. We argue that there was failure to stand at the height of intersection. For us, we simply didn't apply to this action. So we raised related arguments. As the case proceeds, our insight into the legal issues hopefully gets better. I think in your position, the courts lack power to issue an injunction. You never issue financial security or authorizations. No, of course not, Your Honor. These are very unique facts, very specific and unusual bilateral arrangements between the two contexts. At Baker v. Carr, it's very clear that questions about political question are issues of political question are in the interest surgically, on a case-by-case basis, based on the particular facts of the case. So the mere fact that this involves foreign policy and national defense does not automatically trigger political question. What triggers political question here is the fact that this is an agreement that it took a decade to negotiate from 1996 to 2006, negotiated at the highest levels of the U.S. government and the government of Japan, reaffirmed multiple times from 1996 through last month when Secretary Mattis was in Japan and met with the Prime Minister of Japan and the defense minister and their joint statements mentioned the importance of this kind of moving forward. So it's a very particular project and a very sensitive issue because of the bilateral nature of the project. I guess I also wanted to address... It seems you're not asking about your litigating positions, because it seems initially or at the beginning and then earlier you all argued that 402 didn't apply. That's right. And how specific is 402 particularly for us, for you all to comply with that? I don't understand. It seems like it's pretty basic. Did you take into account the denominator? You're right, Your Honor, that it was pretty basic. What the statute provides is rather broad and rather minimal. It's just taking into account that the record shows that the Secretary did do that. The initial position that the agency took in the district court was that this is a Japanese project being conducted by the government of Japan on sovereign Japanese territory at Japanese expense. And, therefore, it's not the Navy's responsibility to take into account it. But what's traditionally held, held otherwise, but did not issue a final order, the Navy went ahead and carried out a take-into-account process. And that's why we see the excerpts of records. So we have not abandoned or reserving the right of the district to act to argue that Section 402 should not apply here. But even if it does, the agency hasn't complied with 402. And I guess I would go to CBD's arguments for why they didn't. And so the reasons that the agency has failed to comply are all based on the assumption that there's a, if some obligation is to consult with members of the government, to consult with stakeholders, similar to the obligations that apply in the domestic context. But that kind of public notice process is extremely problematic when you're talking about a project that's taking place in a foreign country under the jurisdiction of another sovereign. You can't. It creates, it raises philosophic sensitivities. And there's no basis in the statute for assuming that that kind of a public comment process applies in the context of Section 402. So far you haven't addressed really the points that I think are before us, you know, that we're going to need to decide. And I frankly don't have any interest in trying to reason the way or answering the district court. So I guess maybe we can start with standing. I'm inclined to think that your position on standing is completely wrong, especially as to just the immediate determination that the act didn't comply with and the remaining for the secretary or whoever the department is that's going to carry out the due due account process. I don't know how in the world do they not have standing to see that. I think that Simon Spalding, Simon Spalding just provides the answer to that. In any event, to the extent that because the court can't order the secretary to renegotiate the vote, I haven't covered that. Because let's just focus on the post-extractive operational mitigation measures that you alluded to. Let's talk about that. Because that seems like it's just normally within the Department of Transportation. You can't say that, no, there's nothing whatsoever the department has to do to adjust the operation of the piece that's going to be under its control once it's been terminated, right? Well, there is still, and I think that CPD has overstated this, the extent to which there's room for it. Because all the details of these operations have been negotiated. The specific alignment of the runways, the specific types of aircraft, the numbers of aircraft that will be there, the flight paths, are all matters of concern. And the Department of Defense itself is disabled from making any adjustments to them. Not any adjustments at all? That's what I'm saying. That's what I'm saying this morning. I mean, that's a different situation where there's an agency whose conduct is under review that doesn't have the power unilaterally to do anything that would affect people, really, for the plans. But here it seems like the Department of Defense is the agency whose actions are under review. And I don't, unless you're going to tell us that we'll actually know, given the terms of this bilateral agreement, which are not negotiable going forward, we can't do anything to get out of it. I mean, that's a big argument, and I don't think you have the argument outstanding. Well, isn't, I think, the argument outstanding is that any relief that puts the ongoing implementation of this project in doubt or gets to the cloud over it interferes with the political prerogatives of the executive branch, and it is not available. But anything that does not do that doesn't redress CPD's claims. And I guess on these mitigation points, I think it's also important for the Department to be aware of the extent to which mitigation has been addressed in the plans that the two governments have agreed to. The government in Japan conducted an environmental impact statement, which adopts mitigation measures that are intended to minimize the impact on the people. And, of course, the whole reason that we're here, that we think that Japan is arguably under triggers and obligations to do a Section 402 analysis is because it's a cultural property or a cultural property under the law of Japan. So the government of Japan is taking the steps that it's required to under Japanese law to address its capability. I'm just focused on reversibility. I hear you. There's a bigger picture here, and maybe ultimately nothing changes. Fine. No, that's not our concern. We have pretty narrow procedural issues before us. And, again, I'm just on reversibility, that this is a procedural injury that they're trying to remedy, and they don't have to show that the Department of Defense in fact would make the following five changes. They just have to show that it's possible. And we're not even talking about the court compelling the Department to adopt any particular mitigation measure. So that's why your own position to include a watchdog during this conversation seems to be inconvenient. Well, there was a political, there was a procedural injury, and that issue, you know, one of those things that's haven't been brought into the court setting across the United States. Here, I don't think that we, that the government does not concede, and for purposes of argument, we have said that this is a procedural injury, and that's what they're claiming. I'm not sure that Section 402 creates any procedural rights in the plaintiffs' here, because it does not have the type of public comment process. It doesn't call for the type of public process that Zaheba calls for. It's simply an instruction to the Secretary to take some things into account. So, as far as I know, no one would have standing to sue a claimant in violation of 402. It's not the issue before us right here or anywhere. Okay. So, I don't know. Do you have anything else? I mean, I'm wholly unpersuaded by your position, as was the District Court one for addressability with respect to the comparatory litigation. Do you have anything else to say on that, or should we shift to the injunction? Let's shift to the injunction. And if you think of anything else, I'm trying to heartfully work my way back into it. Okay. So, let's just start with the second Baker test with respect to the injunction relief. Why is Twitter the full answer, as your opponent argues? It seems to me that that case arose in a very similar posture, with very similar interests on both sides, competing interests on both sides. And I don't even think the government argued politically. The doctors were there, and the courts even think that the four-part test was an adequate set of standards that would certainly be satisfying the second Baker test. So, why is that? The difference is that we have a bilateral agreement here. We have taken interest in the role of the government of Japan. That makes this different from what we've done. There was no international agreement, international framework for the exercises that were being challenged there. In a way, in applying the injunction standard, the court would have to weigh the interests of the government of Japan, as well as the interests of the United States. So, this is just a more compelling case, a re-application of the Baker's Law, a more compelling case for you to win, under points where I've mentioned that. But why is the court totally without, whatever this word is, judicially manageable, conservative standards, just to make the determination? I don't understand that argument at all. Well, the argument is that the court is not well-equipped to determine what's in the public interest when the government of Japan is deciding what's in its interest for a project that's on its sovereign territory and educating foreign-style historians on freedom. Okay. I hear you. That's your position. That's our position. I think we also have a political question here, under the first Baker's standard, because of the contented nature, the bilateral nature of the agreement. The high-level nature of the agreement, we're talking about an agreement that's been negotiated and endorsed by presidents and secretaries of state, foreign ministers, and secretaries of state, defense ministers of Japan. I think those are the main points that I wanted to address. I don't know if the court is aware of this. I just can't think that the political question doctrine is supposed to be fact-specific and case-specific. And the facts here, like the facts in the court of Caterpillar, or Dreyfus, or there are a few other cases needed in our brief. There are cases where the court just doesn't, we don't want the courts making decisions about whether the secretary of state wants to limit the number of flights into their overseas military base. We're not, that's not what we're looking at. I agree with you. I don't think the court would be in a position to compel specific mitigation measures, but that's not a relief that they're seeking. All they're seeking is a license to stay put until you finish what Congress has  not you personally, but you or whoever, to do. Right? Well, and the Navy's position is it has done much more than would be the minimum requirement under section 402. Did any state court order interfere with the ability to move forward on this international, this kind of migration? That's why you may well, probably would, I wouldn't say that you probably would, but I mean, a four factor test that went to the Navy. But even, but even taking, I mean, this case, this case has been pending since 2003. And we were bottled up in the district court for five years because the judge would tell the client to issue a final order. And then just as he closed the case, this has gone on for a very long time. In 2003, when CPD first came into court, there was a failure to act. The secretary had not taken any action under section 402. Between 2008 and the present, the secretary has done all that. CPD is not, is intent to take yes or an answer. And now they come back and say, well, you did it, but we don't like the way you did it. Now you have to follow all these procedural requirements that are not in the statute. So we've had an awful lot of delay and an awful lot of cloud, being over-capitulated to move forward on this project. It's a matter of intense concern to the government of Chippenham, to local governments in Okinawa. It's been highly contentious there. And being capitated to move forward is very difficult. That would be, could be a good reason for Congress to accept certain projects like this one from the scope of the impact, but it hasn't. So, I mean, I don't think the Department of Defense can claim some immunity from Congress's regulation in this area, or at least it can, but that's, again, not the question that's. Well, I mean, that was out of the statute. First, I see why it's a political question. The question is intended to be addressed. This is not a situation like. That is not what the political question, Dr. Wilson, the time took to address. If you wanted to argue that Congress doesn't have the authority to address military and foreign policy, or is that just a straight constitutional question? Right. Well, that's my point. This is not a case like where there is, it's a flat out, it's a conflict between the executive branch and Congress. Congress says, you must allow a citizen to request that your real supporters be listed on their behalf's court. The executive says, we're not going to do that because we think that's bad foreign policy. At that point, the court needs to weigh in to resolve the international dispute. Here, you have the slimmest of instructions taken into account. Congress has been intimately involved in the process of removing, this base realignment process, to authorize funds for removing service members from the law, to be able to then move the rest of the operations from Zima to Kinshaw, to accommodate the Japanese, who feel overburdened by the number of bases in Okinawa. Congress is involved in this whole process, so they have not expressed any discomfort with the Secretary of Defense's compliance with the National Historic Preservation Act here, or suggested that something else needs to be done in order for this project to go forward. And they have the opportunity to do that because of their role in the realignment process. So it needs to, the court needs to weigh in in an area of foreign policy, and national security is much less than it would have been if there wasn't certain policy. I see. My time is expired. Thank you. I'm going to give you two minutes. Oh, thank you. Go ahead. I really just have three brief brief comments. I'd like to start with suggesting that the National Historic Preservation Act does not currently impose any procedural rights. That's relative to this whole calling in China versus Okinawa, where there are cases of diseases in the brain, but it makes clear that there are cases of diseases in the brain, and the statute does state that there are procedural rights. The second point on salmon spawning versus containers, I'm sure a lot of you have noticed that both parties invoke salmon spawning, and I just wanted to focus in on that disagreement, which is the question of which of those three claims that is an analog for the National Historic Preservation Act claim that the Department of Why the first claim is different from our National Historic Preservation Act claim, and that is because that first claim was an Endangered Species Act claim. It was a challenge to a no jeopardy finding in a biological opinion, which authorized the Pacific Salmon Treaty. Unlike the National Historic Preservation Act, the Endangered Species Act is outcome determinative, and that claim regarding the biome that authorized entry into the treaty was backward-looking. Our National Historic Preservation Act claim, like the third claim in salmon spawning, which was a claim about the obligation to re-initiate consultation, is two-perspective. We are asking the Department of Defense to go through the take-into-account process and consider steps that it might take going forward that could avoid or mitigate any adverse effects. The court made very clear that it is uncertain whether re-initiation will ultimately benefit the groups, just a moment in mind there, certainly, which is the situation we are in here. Lastly, on the question of Zivotofsky and the political question, Dr., I just wanted to focus the court's attention on the political question is about the underlying issue involves the court in a policy of determination, and here it does not refer you to our personally, because we discussed that. Thank you very much. Thank you both. For Mr. Yannick, for your very helpful presentations here today on this very challenging case, the Center for Biological Diversity, which is actually part of our U.S. Department of Justice and the Department of Defense case is now submitted. That concludes our document for this morning for the pre-initiation. Thank you all very much.
judges: Fernandez, Murguia, Watford